ROBERTS, J.,
for the Court:
111. Bertha Mae Wilson was convicted of deliberate design-murder and sentenced to life imprisonment. The sole issue on appeal is whether it was reversible error *546 under Mississippi Rule of Evidence Rule 404(b) for the State to cross-examine Wilson with prior statements that she made to a non-testifying but available psychological expert.
¶ 2. Because there was no contemporaneous Rule 404(b) objection at trial, the issue is procedurally barred. We nonetheless consider the issue on the merits and find that the trial court did not abuse its discretion in admitting the evidence. Accordingly, we affirm the conviction.
FACTS AND PROCEDURAL HISTORY
¶ 3. On the night of August 14, 2011, Wilson stabbed her former fiancé, Marcus Spencer, in the neck with her knife as he lay half-naked in her bed, severing his jugular vein and carotid artery. Spencer fled from the apartment and collapsed outside. As bystanders gathered around Spencer and one of them attempted to help him, Wilson calmly walked up, exclaimed “I did it,” and then kicked Spencer in the face, saying: “Bitch, didn’t I tell you I was going to kill you,” and “I hope you die and burn in hell,” and “How he going to be sleeping with me and my daughter?” Spencer died a short time later due to massive blood loss. At the time, Wilson was thirty-nine years old. She weighed about 230 pounds. Spencer was thirty-six years old. He weighed 185 pounds. Wilson and Spencer were approximately the same height.
¶ 4. The prosecution presented evidence that five days before Wilson killed Spencer, Wilson had called Spencer’s sister. Wilson asked Spencer’s sister to tell Spencer that Wilson was not mad at him anymore. Wilson also wanted Spencer to know that she did not believe what she had heard, and that he should answer her phone call. Afterward, Wilson and Spencer talked over the phone. Spencer agreed to visit Wilson at her apartment.
¶ 5. On the night of August 14, Wilson had her children leave the apartment, so they would not be there when Spencer arrived. The prosecution’s theory was that Wilson had lured Spencer to her apartment so that she could kill him, because she thought that he had slept with her eighteen-year-old daughter.
¶ 6. Prior to trial, the defense sought and obtained funds for a mental-health expert. Dr. Beverly Smallwood examined Wilson and produced a twenty-five-page report. Prior to the examination, Dr. Smallwood told Wilson that her statements were not privileged and would be turned over to the State. The defense listed Dr. Smallwood as a potential witness, and as a consequence, was required by the rules of discovery to turn her report over to the State in advance of trial. The defense decided not to call Dr. Smallwood as a witness.
¶7. Dr. Smallwood’s report contained several statements Wilson made that were inconsistent with her claimed defense that she killed Spencer during the heat of passion. Wilson testified and was cross-examined using her statements from the report. The report itself was never introduced into evidence nor shown to the jury. Ultimately, Wilson was convicted and sentenced to life imprisonment.
I. Pretrial Rule 404(b) Motion in Li-mine
¶ 8. On the morning trial began, the defense argued that Mississippi Rule of Evidence 404(b) prohibited the State from mentioning anything from Dr. Smallwood’s report unless Dr. Smallwood testified. The defense was particularly concerned about the fact that Wilson had told Dr. Smallwood that she had previously used a knife to attack two other men in her *547 home. The victims of her attacks were her ex-husband and a former boyfriend. The State responded that Wilson’s statements might be admissible as impeachment if she testified. Depending on how Wilson testified, the State suggested that the statements might be relevant to lack of mistake, modus operandi, or pattern. Without having read Dr. Smallwood’s report, which had just been furnished to it, the circuit court held that the report would not be admitted, but “depending on the proof at the time,” the matter could be “revisit[ed].”
II. The Defense Theory
¶ 9. During opening statements, Wilson’s attorney said: “That fiery, that rage, that hatred [was] still there. This man had had sex with her [eighteen]-year-old daughter and wanted her to marry him and have sex with her that night. That’s not murder. At worst it’s manslaughter, at best it’s self-defense.” Wilson’s attorney went on to say that Wilson had been sexually abused by her grandfather, raped in the seventh grade by a man she babysat for, and raped by a group of boys in the eleventh grade, causing her to become pregnant and drop out of school. Wilson’s attorney also told the jury that Wilson’s twin daughters had been sexually abused by their father in North Carolina. According to Wilson’s attorney, Wilson was angry because she believed that her daughter had slept with Spencer. But Wilson’s attorney claimed that Wilson did not intend to kill Spencer. Specifically, Wilson’s attorney stated that she “never had any specialized training in martial arts. She doesn’t know the best place to stab somebody if you want to kill them or any of that sort of thing. Okay. She doesn’t know anything about any of that.”
¶ 10. After the prosecution presented its case-in-chief, it argued that Wilson should be prohibited from introducing evidence of her past violent confrontations with other men. Wilson’s attorney argued that such evidence was necessary to present Wilson’s defense. According to Wilson’s attorney, evidence of her previous experiences was necessary to explain the anger and rage that caused her to kill Spencer. Specifically, Wilson’s attorney argued:
Your Honor, the proof of manslaughter deals with state of mind of the defendant at the time that the killing took place. The state of mind of the defendant is— can be proven through the testimony regarding a past and the events that occurred up until the time of the killing. It’s not irrelevant. It’s relevant to her state of mind. It’s relevant as to whether this is a manslaughter case or ... deliberate[-]design murder. I don’t know how else you can make a defense of manslaughter without proving some sort of past anger, something that creates this anger and this frustration. Sometimes it happens immediately, sometimes it happens over the course of many years. I can’t make a defense if I’m not allowed to put on evidence to show that there was every reason to believe that this woman had reached a point to where she snapped, and that is the basis of heat[-]of[-]passion manslaughter.
¶ 11. The circuit court agreed to allow Wilson to put on all of the evidence she wanted to about her violent past to explain why she “snapped.” However, the circuit court pointed out that Dr. Smallwood’s report was not privileged. Referring to the prosecutor, Wilson’s attorney said, “Even if she uses it[,] the fact of the matter is that she can refer to it and our defendant, our client, will have to explain those things.” The circuit court agreed: “[I]t appears to me that the State certainly can cross-examine her with regard to all of *548 those incidents as well as any other incidents that they may have information on.... They have the report and it is fair game.” The circuit court continued:
[T]he defendant can testify to whatever is admissible[,] ... to those things that formed that defendant’s state of mind in the relevant time period. The State can then cross-examine with regard to any items that would cast some doubt on that state of mind and on the credibility of that defendant.... [T]hat doesn’t prohibit [the State ] or the defense from objecting appropriately as the questions are asked....
(Emphasis added).
III. Wilson’s Testimony
¶ 12. On direct examination, Wilson testified consistent with her attorney’s opening statement. When her attorney asked if she had been attacked by men before, she testified that she had been beaten before. Wilson also testified that she had been raped by her grandfather, a man she babysat for, and a group of boys in high school. Wilson went on to say that she went to North Carolina to get her twin daughters from their father, who was sexually abusing them. According to Wilson, Spencer gave her the money to travel to North Carolina. Wilson testified that she and Spencer had dated for approximately two years, and they planned to get married during June 2012. Wilson added that she broke up with Wilson because he had threatened to kill her.
¶ 13. Wilson claimed that after she had broken up with Spencer, she found a text message on her son’s phone that made her think that Spencer had slept with her daughter. She confronted her daughter about it and became convinced that her suspicion was correct. Wilson testified that Spencer had called her several times during the week that she confronted her daughter, but she told him to stay away from her because she did not want to have anything to do with him.
¶ 14. According to Wilson, Spencer showed up at her apartment on the night of August 14 and insisted that she have sex with him. Wilson testified that Spencer said he was “going to get him some,” and that he “did not come this far ... for nothing.” Wilson stated that she had just gotten out of the shower, she was only wearing her bathrobe, and Spencer followed her to her bedroom. Wilson testified that Spencer shoved her against the wall, and she fell to the floor. She testified that Spencer disrobed and sat on Wilson’s bed fondling himself. Wilson testified that she flew into a rage and stabbed Spencer with a knife that was conveniently on a chair in her bedroom. Wilson’s attorney asked her why she had the knife, and she responded: “I have several of them. I just like knives.” Wilson admitted that she followed Spencer outside, kicked him in the head, and told him to die. Wilson testified that she also called Wilson a sick pervert. But she denied that she said she had told him that she was going to kill him.
¶ 15. During cross-examination, the prosecutor asked Wilson: “Isn’t it true that when you met with [Dr. Smallwood,] you told her that you keep knives hidden all around your house?” Wilson answered, “That’s correct.”
¶ 16. The prosecutor asked Wilson whether she had ever used sex as a tool against men. Wilson denied that she had. The prosecutor then asked Wilson whether she had said that to Dr. Smallwood. Wilson’s attorney objected that the question called for hearsay, and it would create a confrontation violation because he could not cross-examine the report. The circuit court noted that it was Wilson’s own statement and therefore not hearsay, and that *549 Dr. Smallwood was not unavailable if the defense wished to call her. Defense counsel conceded that Dr. Smallwood was available to testify.
¶ 17. The prosecutor then asked if Wilson had told Dr. Smallwood that she “would get them before they got me. It’s like turning the table.” Wilson admitted that she had said that to Dr. Smallwood. Regarding Wilson’s testimony that she had been beaten in the past, the prosecutor asked:
Q. Isn’t it true that these episodes where you say that you have been beaten before.... That you actually joined a gang when you were younger?
A. I did.
Q. And the two ways that you can be initiated into a gang are what? Can you tell me?
A. Sexually or jumped in.
Q. What is jumping in?
A. Where three guys — three males and three females fight you, jump on you for a certain amount of time.
Q. And which way did you choose to be initiated?
A. Jumped in.
Wilson’s attorney did not object.
¶ 18. Concerning Wilson’s attack on Spencer in her home, the prosecutor asked: “[I]sn’t it true that you have been in this situation before.... A man that you’ve been dating or married to in a house where you have a knife?” Wilson replied, ‘Tes.” The prosecutor then asked: “[Ijsn’t it true when you spoke with Dr. Smallwood you described those incidents as tension relief for you?” Wilson again admitted that she had. Again, there was no objection. Finally, the prosecutor asked Wilson if she had been armed with a knife in two similar situations in the past; once with a former boyfriend, and once with an ex-husband. Concerning one of the incidents, the prosecutor asked:
Q. You told Dr. Smallwood he made it to the kitchen, [“]I grabbed a knife, I flung it at him, it stuck to the door. I told my mom to watch the kids and don’t let them out. I went looking for him. I was angry.f”] Do you remember talking about that with Dr. Smallwood?
A. Yes, I did. I remember.
Again, there was no objection.
¶ 19. On redirect, Wilson explained that she was no longer in a gang and she no longer believed the past statements she had made about men. She said she outgrew that attitude and no longer felt that way during the night she killed Spencer.
¶20. After Wilson left the stand, the circuit court conferred with the attorneys and explained its ruling regarding’the use of Dr. Smallwood’s report. The circuit court asked if either the prosecution or the defense requested anything further on the record. Both attorneys declined the circuit court’s invitation. As previously mentioned, the jury found Wilson guilty of murder.
IY. Hearing on Wilson’s Posttrial Motions
¶ 21. Wilson filed a motion for a judgment notwithstanding the verdict or, alternatively, for a new trial. At the hearing on Wilson’s posttHal motions, her attorney argued that the evidence was insufficient to find her guilty of murder, and that the circuit court erred in allowing the State to use Dr. Smallwood’s report because it was privileged. Wilson’s attorney did not claim that the State’s cross-examination of Wilson was improper under Rule 404(b). The circuit court found no merit to Wilson’s posttrial motions. The circuit court noted that Dr. Smallwood’s report re- *550 fleeted that she had advised Wilson that her statements would not be confidential. Concerning Dr. Smallwood’s report, the circuit court noted that Wilson chose to testify, and she knew that “she was open to cross-examination” on it. The circuit court explained that it was permissible for the prosecution to cross-examine Wilson with Dr. Smallwood’s report because:
Wilson had raised as a defense her state of mind ... with regard to the heat[-]of[-]passion defense. Once she raised her state of mind and raised the fact that she was afraid or that she felt she was being attacked, she herself testified to prior incidents in her life that caused her to have the state of mind that she claimed she had had[,] making her state of mind then fair game for cross-examination. These prior incidents, which quite frankly the State didn’t go into as much detail as was in the report, but the State then had the right to cross-examine her about the other incidents that might also have refuted what she claimed was her state of mind. So based on that it still appears to the Court that the information in the report was available to the State[,] ... and the State made proper use of it based on the facts and the evidence as it then occurred.
STANDARD OF REVIEW
¶ 22. The standard of review concerning the admission of evidence is abuse of discretion. Shearer v. State, 423 So.2d 824, 826 (Miss.1983). This same standard applies to the introduction of evidence under Mississippi Rule of Evidence 404(b). Richardson v. State, 74 So.3d 317, 329 (¶¶ 39-40) (Miss.2011). We will reverse “only if such discretion has been abused and a substantial right of a party has been affected.” Id. at (¶ 39).
ANALYSIS
¶ 23. Wilson claims that the State improperly introduced evidence to show her bad character in violation of Mississippi Rule of Evidence 404(b). Rule 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
However, Wilson did not object under Rule 404(b) when the prosecution presented the evidence at issue. Consequently, this issue is proeedurally barred. Smith v. State, 986 So.2d 290, 295 (¶¶ 13-14) (Miss. 2008).
¶ 24. Smith also involved a murder trial. During Smith’s trial, an investigator testified that during interviews, Smith admitted that he had committed numerous crimes. Id. at 293-94 (¶ 7). Smith’s attorney objected to the investigator’s testimony based on hearsay and the inability to confront the evidence, but the objections were overruled. Id. at 295 (¶ 14). On appeal, Smith argued that the testimony was improper evidence of prior bad acts in violation of Rule 404(b). Smith, 986 So.2d at 295 (¶ 11). The Mississippi Supreme Court held that Smith had “waived any argument concerning character evidence when he failed to raise it in the trial court.” Id. at (¶ 14). The supreme court further held:
This Court has held an objection must be made with specificity, and failure to articulate the grounds for objection constitutes a waiver of the alleged error. Further, we have held that an objection on one or more specific grounds constitutes a waiver of all other grounds.
*551 This Court noted ... that an objection cannot be enlarged in the reviewing court to embrace an omission not complained of at trial. This Court cannot find that a trial judge committed reversible error on a matter not brought before him or her to consider.
Id. at (¶ 13) (internal citations and quotation marks omitted).
¶25. Wilson claims that her pretrial motion in limine concerning Rule 404(b) in relation to Smallwood’s report preserved her objection during the prosecution’s cross-examination of Wilson. When a party in advance of trial seeks to exclude evidence from a jury, she faces a formidable task. She must convince the trial court that “(1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury.” Wright v. Royal Carpet Servs., 29 So.3d 109, 115 (¶ 13) (Miss.Ct.App.2010) (quoting Whittley v. City of Meridian, 530 So.2d 1341, 1344 (Miss.1988)).
¶ 26. Wilson relies on Parvin v. State, 113 So.3d 1243 (Miss.2013). In Parvin, the defense moved before trial to exclude as speculative the state expert’s opinions on gun distance and bullet trajectory. The circuit court denied the motions. Id. at 1247-48 (¶¶ 15-18). The defendant nonetheless personally tried to object to the testimony while it was being given but was admonished to speak only through his attorney. Id. at 1248 (¶ 19). Specific objections to the reliability of the opinions were again made when the witness left the stand and in motions to set aside the verdict after trial. Id. at (¶20). In ruling that the objection had been properly preserved, the supreme court noted: “Given the numerous attempts to exclude [the witness’s] testimony, we cannot agree with the State that the issue is procedurally barred. The trial judge was given several opportunities to consider the reliability of the autopsy report, and he rejected each one.” Id. at (¶ 21).
¶ 27. This case is not at all like Panin. In the present case, the circuit court said it would “revisit” the issue as the proof developed, but Wilson never raised another objection under Rule 404(b). Wilson’s attorney seemed to agree when the circuit court explained the ground rules for Wilson’s cross-examination prior to her testimony. Wilson’s attorney declined the circuit court’s invitation to add anything to the record after Wilson testified. And Wilson’s attorney did not raise an objection under Rule 404(b) during the hearing on Wilson’s posttrial motions.
¶ 28. Wilson also relies on Goff v. State, 14 So.3d 625 (Miss.2009). Goff held that a defendant who had lost a pretrial motion to suppress specific evidence did not need to renew that objection when the specific evidence was offered at trial. Id. at 640 (¶ 46). Unlike the suppression issue in Goff, which did not change based on how other evidence in the case developed, the state-of-mind and intent issues crystalized during the course of Wilson’s trial. Only when Wilson testified did she expose herself to cross-examination. Only then did the State have the right to contradict her testimony with her prior inconsistent statements. Those prior statements dealt with violent subjects because Wilson’s justification for the attack was based, in part, on her violent past.
¶ 29. Goff relied in part on Kettle v. State, 641 So.2d 746 (Miss.1994). In Kettle, the defense moved before trial to prohibit the State from relying on a lab supervisor, rather than the chemist who performed the drug test, to testify as to the results of the test. The trial court denied the motion, stating that the defen *552 dant could cross-examine the supervisor about the issue. Thereafter, the supervisor testified without objection by the defendant. The supreme court held that the objection was properly preserved. Id. at 748. The supreme court was careful to observe, however:
A different result may be warranted where there is a significant change in the basis for admitting the evidence. When this occurs, a further objection may be required. Here, there was no change in the basis for admitting the evidence from the time the in limine ruling was made until the evidence was introduced at trial. Therefore, the ... objection to the in limine ruling preserved the point.
Id. at 748^49 (quoting Wimer v. Hinkle, 180 W.Va. 660, 379 S.E.2d 383, 386 (1989)).
¶ 30. That is precisely the situation in the present case. The circuit court informed the parties before trial began that “depending upon the proof,” the issue could be “revisit[ed].” Then, before the defense put on its case, the circuit court gave the parties fair notice that if Wilson testified to prior events in her life that led her to commit the act on trial, the State would be allowed to cross-examine her on her statements from the report. There was no unfair surprise. The defense was warned to make whatever objections to the questioning it deemed were necessary. The only objections made were as to hearsay and confrontation. These are not the same objections Wilson now raises on appeal. Wilson’s Rule 404(b) objection is therefore procedurally barred.
¶ 31. Procedural bar notwithstanding, this issue is meritless. Wilson cites to Chambers v. State, 800 So.2d 1178 (Miss.Ct.App.2001). In Chambers, the trial court ruled before trial that the State would not be allowed to offer evidence of the defendant’s drinking habits unless the defense first offered evidence of his good character. In its case-in-chief, the prosecution called an. investigator who testified, over the defendant’s objection, that the defendant told him that he preferred to drink alone because he got angry when he drank. Id. at 1182 (¶ 11). On appeal, this court upheld the admission of this evidence, noting:
We agree that the testimony presented evidence of Chambers’[s] state of mind or motive for the shooting and not of prior bad acts. Chambers and Ferguson were arguing and drinking when the shooting occurred[,] and the State elicited none of the prior bad acts evidence complained of by Chambers. We conclude that the admission of the evidence in this case was not unduly prejudicial to Chambers.
Id. at (¶ 13).
¶ 32. Application of the holding in Chambers shows that no error occurred in the present case. In Chambers, the circuit court initially ruled that the Rule 404(b) evidence would not be admissible. In the present case, the circuit court specifically stated that the issue could be “revisit[ed]” as the case developed. As in Chambers, it became evident that the Rule 404(b) evidence was admissible to show state of mind, plan, and motive.
¶ 33. In Fisher v. State, 532 So.2d 992 (Miss.1988), the defendant was on trial for rape. He had flashed his car headlights to get the victim to pull over and then raped her. A witness testified at trial, over the defendant’s Rule 404(b) objection, that the defendant had flashed his lights to get her to pull over on another occasion. The supreme court upheld this evidence of other bad acts, commenting: “The evidence of Fisher’s modus operandi was not adduced to identify him, but to show his ‘plan’ for assaulting women. Thus, it was admissi *553 ble under Rule 404(b).” Fisher, 582 So.2d at 1000.
¶ 34. In Moss v. State, 727 So.2d 720 (Miss.Ct.App.1998), the defendant was on trial for murdering his wife. His defense was that it was an unplanned act done in the heat of passion. Id. at 725 (¶ 21). The supreme court upheld the introduction of acts of past physical abuse of the wife to show “a continuing pattern of violence,” which was relevant to show the defendant’s “motive and intent.” Id. at (¶ 19).
¶ 35. As in Fisher and Moss, Wilson’s past violence toward men she was romantically involved with, but with whom she was in conflict, was probative to show modus operandi, plan, motive, and intent. Her specific weapon of choice was knives. As she volunteered on direct examination: “I have several of them. I just like knives.”
¶ 36. Wilson also complains about the prosecutor’s question relating to her violent gang initiation. Wilson acknowledges that evidence of gang activity may be relevant, such as in Hoops v. State, 681 So.2d 521, 530 (Miss.1996), where it was held admissible under Rule 404(b) to show a motive for a shooting. Wilson complains, however, that the circuit court did not conduct a balancing test as required by Mississippi Rule of Evidence 403, which provides that, “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice....”
¶ 37. It is true that the circuit court did not weigh the probative value of the evidence versus its prejudicial effect on the record. This is not always required, however. In Hoops, the circuit court also failed to use the “magic words,” but the supreme court noted that the circuit court had “implicitly made” that determination. Id. at 531; see also Dao v. State, 984 So.2d 352, 361 (¶ 33) (Miss.Ct.App.2007) (Rule 403 analysis implicit where court considers arguments for and against admission of Rule 404(b) evidence); Hudson v. State, 977 So.2d 344, 349 (¶25) (Miss.Ct.App. 2007) (balancing may be implicit). In Jones v. State, 920 So.2d 465 (Miss.2006), the supreme court stated that it “do[es] not interpret this requirement to be a regimented procedure^] ... Though this Court certainly expects trial judges to have considered Rule 403 in making their evidentiary rulings, we certainly do not predicate the soundness of these determinations on the express use of magic words[.]” Id. at 476 (¶ 34) (citation omitted). Likewise, in Archer v. State, 118 So.3d 612, 625 (¶57) (Miss.Ct.App.2012), we noted that “our review depends on the evidence and not the judge, and while a judge’s on-the-record analysis is recommended as it serves to fortify the judge’s position for purposes of review, the lack of such analysis is harmless unless we deem the evidence to be patently prejudicial.” Id. (citing Jones, 920 So.2d at 476 (¶ 34)). Here, the evidence, while certainly prejudicial, was not unfairly so, since its probative value was great.
¶ 38. Where, as here, a defendant fails to make a contemporaneous Rule 404(b) objection, the circuit court cannot be faulted for failing to conduct an explicit on-the-record Rule 403 analysis. In any event, it is clear that the probative value of the limited cross-examination at issue here far outweighed any danger of unfair prejudice. Whether Wilson had lured Spencer to her apartment under the pretense of reconciliation and sex, but planned to kill him at an opportune moment, or whether Wilson acted spontaneously in a fit of rage based on her prior history of having been sexually violated by men, was front and center in this case. If the former, Wilson likely committed premeditated murder. If the latter, Wilson likely committed manslaughter.
*554 ¶ 89. The evidence at trial made one thing perfectly clear to the jury: Wilson’s rage against Spencer was real. She believed her fiancé had sex with her daughter.[1] The key issue to resolve was — did the anger rise up suddenly and unexpectedly, or did Wilson entice Spencer to her home with murder on her mind? Wilson introduced her past violent interactions with men, over the State’s objection, in an attempt to sway the jury to accept that her rage was sudden and irresistible. The prosecution was entitled to use Wilson’s own prior statements to show that she was perfectly willing to use violence, specifically including attacks with a knife, against men in her life she felt had wronged her. There was no violation of Rule 404(b). Finding no reversible error, we affirm Wilson’s conviction.
¶ 40. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF DELIBERATE-DESIGN MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
IRVING AND GRIFFIS, P. JJ„ ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. LEE, C.J., AND BARNES, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION.

. Unfortunately for Wilson, "needed killing” is not one of the legal justifications for homicide as set forth in Mississippi Code Annotated section 97-3-15 (Rev.2006).